Cite as 2020 Ark. App. 426

# ARKANSAS COURT OF APPEALS

DIVISION IV

No. CV-19-857

|  |  |
|---|---|
| EARL BETTS AND AMY BETTS<br>APPELLANTS<br><br>V.<br><br>USAA GENERAL INDEMNITY<br>COMPANY<br>APPELLEE | Opinion Delivered September 23, 2020<br><br>APPEAL FROM THE BENTON COUNTY<br>CIRCUIT COURT<br>[NO. 04CV-17-78]<br><br>HONORABLE JOHN R. SCOTT, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Judge

Under Arkansas law, when a vehicle is a total loss after a wreck, must an automobile insurer pay the sales tax and title fees to its policyholder; or may the insurer pay the sales tax and title fees directly to a secured creditor rather than the policyholder?[1] The circuit court answered the question in favor of a secured creditor, Ally Financial, Inc., rather than policyholders Earl Betts and Amy Betts. This means that the automobile insurer, USAA General Indemnity Company, was not liable to the policyholders (the Bettses) and was therefore entitled to a judgment as a matter of law. Ark. R. Civ. P. 56(c)(2) (2019).

We affirm the circuit court's decision.

---

[1]In 2019, we dismissed Amy and Earl Betts's appeal without prejudice for lack of a final, appealable order. *Betts v. USAA Gen. Indem. Co.*, 2019 Ark. App. 250, 576 S.W.3d 478. All third-party defendants have been dismissed from the case, and we now have a final order to review.

I. *Discussion*

A. Background

In 2016, the Bettses bought a new Jeep Wrangler, and USAA insured it. Everett CDJR, LLC, was the Arkansas-based dealership that sold the Jeep to the Bettses. It also sold them a Guaranteed Asset Protection (GAP) policy. A GAP policy is designed to cover the difference between what a standard insurance policy will pay on a claim and the amount the automobile owner actually owes on a vehicle when it is badly damaged or totaled. In other words, a GAP policy helps lessen the risk of loss an owner faces as a vehicle depreciates.

Ally Financial was the company that loaned the Bettses the money to buy the Jeep. They, in turn, gave Ally a purchase-money security interest in the vehicle when they signed the installment sales contract to close the deal. Ally's security agreement required the Bettses to maintain an insurance policy on the Jeep, which they did through USAA. (This said, it appears that the Bettses did not inform USAA of Ally Financial's position as a secured creditor.)

After the Bettses were involved in a wreck in southern Missouri, a claim was made on the USAA policy. The Jeep was declared a total loss. USAA (the insurer) paid Ally (the secured creditor) $32,273.19. The breakdown was as follows: $30,243.00 was paid for the Jeep's actual cash value; $2,015.80 was for the sales tax paid; $10.00 for a title fee; $2.89 was for the validation-decal fee; $.50 went toward the lien filing fee; and $1.00 was paid for the registration fee. Everett, the GAP provider, paid Ally $3,764.26. There was an offset of $2,030.19 in sales taxes and fees itemized in Everett's GAP settlement payment to Ally. The

2

offset occurred because USAA had already paid the $2,030.19 in taxes and fees directly to Ally. After these payments, the Bettses still owed Ally $2,003.65 on the initial loan.

The Bettses did not like that USAA paid Ally the sales-tax and fee amounts. They demanded that USAA reimburse them, not Ally, for the sales tax, the transfer fee, the decal fee, and the registration fee. When USAA refused to do so, the Bettses sued USAA in the Benton County Circuit Court. USAA counterclaimed against the Bettses and asked for a declaratory judgment on what obligation, if any, USAA had to pay the sales tax and fees directly to the Bettses. In addition to its counterclaim, USAA also filed a third-party complaint against the lienholder, Ally, and against Everett (the dealership). The third-party complaint was filed because USAA wanted to recoup from either Everett or Ally the $2,030.19 in taxes and fees if USAA was ordered to pay the money directly to the Bettses. Ally cross-claimed against the Bettses for the deficiency balance ($2,003.65) remaining on the installment contract.

B. USAA's Motion for Summary Judgment and the Bettses' Response

After the parties had postured by way of their pleadings, USAA moved for summary judgment for three particular reasons:

● Ark. Code Ann. § 23-89-211 (Repl. 2014) and USAA's insurance contract defines "actual cash value" as including sales tax and certain fees;

● Ally—the holder of a valid lien amount that exceeded the amount of the insurance payment on the loss of the Jeep—properly received the entire insurance payments as an equitable lienholder or as a secured creditor; and

3

● Ally's contract with the Bettses required the Bettses to send any insurance payments to Ally, so the Bettses were not harmed when USAA paid the sales tax and fees to Ally instead of to them.

The court granted summary judgment to USAA on the Bettses' complaint against it, and it did so on all three grounds that USAA raised in its motion. The Bettses appealed and now challenge each ground on which summary judgment was granted against them.

Here, as before, the Bettses argue that Ally had no secured interest in the sales tax and title fees because they did not finance the taxes and the title fees as part of the deal; they paid those costs out of pocket. So the litigation essentially arose because the money that Ally (secured creditor) received from USAA (the automobile insurer) and Everett (GAP insurer) was not enough to satisfy the unpaid loan balance on the Jeep. This was so because the Bettses owed more money on the loan than the Jeep was worth due to depreciation. The Bettses specifically argued to the circuit court—and do so here again—that if there had not been a $2,020.19 offset for the money that USAA had paid to Ally to cover the fees and taxes, then the GAP coverage could have paid the underwater amount ($2,003.65) to Ally. This event, says the Bettses, would have allowed them to keep the tax and title fees that they paid out of pocket as a cost of buying the new Jeep.

In the Bettses' view, there is no legal authority for USAA to pay the tax and title fees directly to Ally. Arkansas Code Annotated section 23-89-211, which we will discuss in some depth below, does not define what a total loss is, but it does require that tax and title fees must be paid when there is a total loss. Ark. Code Ann. § 23-89-211 (Repl. 2014). The Bettses contend that the tax and title fees are a "separate element of damage" that must

4

be paid in addition to an insurer's total-loss payment. They argue that nothing in their insurance contract with USAA permits it to pay the tax and title fees to Ally because the "actual cash value" payable under the insurance contract *does not include tax and title fees*. Instead, the Bettses argue that they were the proper payee, not Ally, because Ally did not have a lien interest in the "special statutory damages for tax and license fees" because it did not finance the payment of the tax and fees. In the Bettses' view, this means that Ally's purchase-money security interest did not extend to the tax and license fees, and the itemized and offset tax and title fees were not proceeds under Article 9 of the UCC.

1. *"Actual cash value" includes taxes and fees*

There is some common ground in this case. The Bettses do not dispute that the value of the Jeep when the collision occurred was $30,243. And no one disputes that USAA contracted to insure the Bettses as a first party for this total loss. The parties do dispute the legal effect of a specific section of the USAA insurance policy—namely, "Part D-Physical Damage Coverage," which appears under the comprehensive-collision sections of the policy. It is in Part D that the policy defines a term that the parties put at issue: "actual cash value."

Here is how the policy defines that term:

> "Actual cash value" means the amount that it would cost, at the time of loss, to buy a comparable vehicle. As applied to your covered auto, a comparable vehicle is one of the same make, model, model year, body type, and options with substantially similar mileage and physical condition.

Of course the insurance contract defines USAA's obligation to pay. And Section A limits USAA's liability when there is a "total loss to your covered auto." In other words,

5

any payment under the policy is limited to the "actual cash value of the vehicle, inclusive of any custom equipment."

Arkansas Code Annotated section 23-101-103(1) (Repl. 2014), which is part of the insurance code, defines "actual cash value" as "the cost of replacing damaged or destroyed property with comparable new property, minus depreciation and obsolescence[.]" Another statute in the insurance code, section 23-89-211, states the following (with our emphasis):

> (a) If an insurer settles a claim for damages to an automobile as a total loss to its own insured or a person having a claim against its insured, the insurer *shall include with the payment for the loss*:
>
> (1) All applicable taxes, including sales taxes and fees as required under Rule and Regulation 43 of the State Insurance Department; and
>
> (2) An itemized list stating the amount of the claim attributable to the value of the automobile and attributable to the sales tax on an automobile of that value.
>
> (b) When settling a claim against an insured for damages to an automobile as a total loss, *the insurer will take into consideration all applicable taxes, license fees, and other fees*.

There is a regulation in play, too. Regulation 43 of the State Insurance Department was promulgated by the Arkansas Insurance Department under the authority given to it by the General Assembly. *See* Ark. Stat. Ann. §§ 63-3001 to 66-5215 (Repl. 1960 & Supp. 1975). Regulation 43's purpose "is to define certain minimum standards which, if violated with such frequency as to indicate a general business practice, will be deemed to constitute unfair claims settlement practices." Ark. Admin. Code 054.00.43-1 (Westlaw current through 15 July 2020). *See also* Ark. Code Ann. § 23-66-207 (Supp. 2019) (rule to identify prohibited methods of competition, acts, or practices).

In particular, section 10 of Regulation 43 provides (with our emphasis):

(a) When the insurance policy provides for the adjustment and settlement of first party automobile total losses on the basis of *actual cash value* or replacement with another of like kind and quality, one (1) of the following methods must apply:

(1) The insurer may elect to offer a replacement automobile which is a specific comparable automobile available to the insured. All applicable taxes, license fees and other fees incident to transfer of evidence of ownership of the automobile must be paid at no cost to the insured other than the policy deductible. The offer and any rejection thereof must be documented in the claim file.

(2) The insurer may elect a cash settlement *based upon the actual cost*, less any deductible provided in the policy, to purchase a comparable automobile, *including all applicable taxes, license fees and other fees* actually incurred incident to transfer of evidence of ownership of a comparable automobile.

Ark. Admin. Code 054.00.43-10 (Westlaw current through 15 July 2020). Some other Arkansas statutes touch on the fees for registration and licensing of vehicles, too; but none govern this case, so we will not dust them off today. *See* Ark. Code Ann. § 27-14-601 (Supp. 2019); Ark. Code Ann. § 26-52-301 (Supp. 2019).

That is a lot of legal minutiae to digest. A summary of the essence of these legal authorities, the insurance contract's key terms, and why they matter is in order.

The "actual cash value" to be paid in the event of a total loss under the insurance code is defined in a slightly different way from how the same term is defined in the Bettses' USAA insurance contract. But does this difference make a meaningful legal difference in this case? We do not think so. Under either definition, the term refers to the replacement cost of a vehicle, less depreciation for age and condition. Put differently, the definitional difference has no legal consequence here because the cost of acquiring a comparable vehicle in Arkansas necessarily includes state sales tax and title fees as part of the payment in a total-

7

loss claim. Ark. Admin. Code 054.00.43-1 (Westlaw current through 15 July 2020). For its part, USAA agrees that it was obligated to pay sales tax and fees under its policy as part of the Jeep's "actual cash value." We therefore reject the Bettses' argument that the General Assembly created a separate and distinct element of damages for tax and title fees in addition to the insurer's responsibilities when there is a total loss.

The critical issue, however, is whether the insurance carrier (USAA) must pay the value of the itemized taxes and fees to the lienholder (Ally) or its insured (the Bettses). Unfortunately, Arkansas's insurance statutes and regulations do not directly answer this seemingly routine question.

2. *In this case, a total loss requires the insurance carrier to pay "actual cash value"*
*to the creditor and not the policyholder*

USAA's insurance contract states that a total-loss claim is payable to "the named insured and the loss payee shown on the Declarations." Ally, however, was not identified as a loss payee in USAA's declarations page. USAA blames the Bettses for this omission. It says the omission occurred because the Bettses failed to disclose to USAA that they had a lienholder (Ally). Yet there is no proof in the record that Ally made any effort prior to the wreck to confirm that its borrowers (the Bettses) had adequate insurance or to ensure that it obtained an endorsement as a "loss payee" or "lender loss payee" on the policy. In this case, however, these oversights are much ado about nothing because under the retail-installment contract's terms between Ally and the Bettses, the Bettses agreed to maintain insurance on the Jeep to "cover[] loss of or damage to the vehicle," and they expressly granted a security interest to Ally in the vehicle, in "all money or goods received (proceeds) for the vehicle, and "all proceeds from insurance" payable to them.

8

A lien is "[a] legal right or interest that a creditor has in another's property, lasting usu. until a debt or duty that it secures is satisfied." Lien, *Black's Law Dictionary* (11th ed. 2019). Arkansas law on liens is underdeveloped; but it is clear enough that an equitable lien may be created by contract or by implication from the parties' conduct and dealings. *See Butcher v. Beatty*, 2009 Ark. App. 662, at 5, 345 S.W.3d 216, 219, *overruled on other grounds by Butcher v. Beatty*, 2010 Ark. 130; *see also Ward v. Stark*, 91 Ark. 268, 273, 121 S.W. 382, 283 (1909) ("Equity requires no particular words to be used in creating a lien. It looks through the form to the *substance of an agreement*; and if . . . the intent appear(s) . . . to pledge property . . . as a security for an obligation, . . . the lien follows."). Liens may also be statutory creatures, like an auto-repair lien, Ark. Code Ann. § 18-45-201 (Repl. 2015). Or more to the point in this case, a lien is akin to a purchase-money security interest, which is a legal claim that allows a lender to either repossess property financed with its loan or to demand repayment in cash. Ark. Code Ann. §§ 4-9-102, 103, & 107 (Repl. 2001). A purchase-money security interest in a good secures the repayment of the debt and functions much like a lien. *See id*.

Applying these legal principles, we hold that the circuit court did not err in concluding that USAA must pay the value of the itemized taxes and fees to Ally and not to the Bettses. The Bettses consented to Ally's taking a security interest in the insurance proceeds and the Jeep when they signed the retail-installment contract. A purchase-money security interest includes "obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes . . . administrative charges . . . and other similar obligations" when there is a "close nexus between the acquisition of collateral and secured obligation."

9

Ark. Code Ann. § 4-9-103 cmt. 3. The Bettses agreed that Ally would be a loss payee in the retail-installment contract, so just because Ally was not identified as a loss payee in USAA's declarations page does not mean that it did not have an equitable lien on the USAA insurance proceeds. Moreover, a secured party does not necessarily have to be a named payee to have its secured interest. *See* Ark. Code Ann. § 4-9-315(a)(2) (Repl. 2001) (explaining a secured party's rights on the disposition of collateral and in the proceeds); *see also* Ark. Code Ann. § 4-9-102(a)(64)(E) (Repl. 2001) (defining "proceeds"). Before USAA made any payment on the loss, USAA received notice that Ally was the lienholder on the Jeep, one that claimed an entitlement to the insurance payout as a substitute for its collateral. The Bettses have not argued that Ally failed to attach or perfect its security interest. Their argument is solely that Ally did not finance the payment of tax and license fees; therefore, Ally did not have a lien on the tax and fees amounts.

This argument stumbles. It fails to persuade because, contrary to the Bettses' point, the insurance proceeds are a legal substitute for the insured collateral (Jeep). That is why Ally required the Bettses to carry an insurance policy on the Jeep. As outlined in the retail-installment contract between the Bettses and Ally, insurance proceeds that are paid after the destruction of a creditor's security interest replace the collateral (Jeep) in a different form (money). USAA, as required by its own policy and Arkansas law, itemized sales tax and other fees as part of the "actual cash value" it paid in the total-loss settlement. So when the collateral for the loan was declared a total loss, Ally was entitled to all of the proceeds in the total-loss settlement as a secured creditor and put them toward its claim given the facts presented in this case.

The circuit court was correct when it ruled that USAA has no legal obligation to pay the itemized sales tax and other fees to the Bettses rather than to Ally.

### 3. *The contract required the Bettses to pay Ally and they incurred no harm*

As we have said, the Bettses assigned to Ally any right to insurance payments made to them when they signed the retail–installment contract granting Ally a security interest. If USAA, for example, did not know of Ally's claim and had issued the $32,273.19 total–loss payment solely to the Bettses, then the Bettses would still be legally obligated to turn that money over to Ally. How then can the Bettses show that they were harmed when USAA paid the sales tax and fees to Ally instead of to them? Similarly, USAA was only obligated to pay the $2,020.19 for sales tax and fees once, which was included in the $32,273.19 payment. This means the Bettses cannot establish that the offset credit to Everett as the GAP provider has harmed them. The circuit court was correct when it granted summary judgment on this point.

## II. *Conclusion*

Because there is no genuine issue as to any material fact in dispute given the parties' pleadings and the proof of record, and because we agree with the circuit court's decisions as a matter of law, the summary judgment in favor of USAA is affirmed.

Affirmed.

VIRDEN and BROWN, JJ., agree.

*Caddell Reynolds, P.A.*, by: *Bill G. Horton*, for appellants.

*Baker Hostetler LLP*, by: *Rodger L. Eckelberry*, pro hac vice; and *Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Lyn P. Pruitt* and *Megan D. Hargraves*, for appellee.

11